<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MONIQUE C.,<br><br>    Plaintiff,<br><br>        v.<br><br>FRANK BISIGNANO, COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Case No. 2:25-cv-11858 (BRM)<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Plaintiff Monique C.'s ("Plaintiff") appeal of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 405(g). (ECF No. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). Having reviewed and considered the submissions filed in connection with the appeal and having declined to hold oral argument in accordance with Local Civil Rule 78.1(b), for the reasons set forth below and for good cause shown, Plaintiff's appeal of the Commissioner's final decision is **DENIED**, and the Commissioner's decision is **AFFIRMED**.

I.      **BACKGROUND**

    A.      **Procedural History**

This matter arises out of the Commissioner's final decision denying Plaintiff's application for DIB, dated May 17, 2024. (*See generally* ECF No. 1–3.) On March 7, 2023, Plaintiff applied for DIB alleging disability due to severe impairments beginning January 1, 2023, including but not limited to "bilateral tarsal tunnel syndrome, bilateral plantar nerve lesions, left knee arthritis,

headaches, hypertension, morbid obesity, depression disorder, anxiety disorder, kidney disease, status post-ovarian cystectomy, [and] low back pain." (ECF No. 1 ¶ 6; *see also* Transcript of Proceedings[1] ("Tr.") (ECF No. 5) at 213–17.) Plaintiff also applied for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq. (ECF No. 1 ¶ 6; *accord* Tr. at 218–24.) The Commissioner initially denied the application for both DIB and SSI on August 17, 2023 (ECF No. 1 ¶ 7; *accord* Tr. at 129–35), and again upon reconsideration on October 23, 2023 (ECF No. 1 ¶ 8; *accord* Tr. at 144–51).

Plaintiff, through counsel, then filed a written request for a hearing. (ECF No. 1 ¶ 8; *accord* Tr. at 152–53.) Administrative Law Judge ("ALJ") Gina A. Pantuso ("ALJ Pantuso") held a hearing on April 11, 2024. (ECF No. 1 ¶ 9; *accord* Tr. at 70–90.) In a decision dated May 17, 2024, ALJ Pantuso found Plaintiff was not disabled within the meaning of the Act as her "allegations of chronic kidney disease and low back pain are not associated with any medically determinable impairments," she "has the residual functional capacity to perform sedentary work," and considering her "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [she] can perform." (Tr. at 45–65; *accord* ECF No. 1 ¶ 10.) The decision became final when the Appeals Council declined review on April 18, 2025. (ECF No. 1 ¶¶ 11–12; *accord* Tr. at 7–13.)

On June 16, 2025, Plaintiff filed a civil action appeal of the final decision denying her application for DIB with this Court pursuant to 42 U.S.C. § 405(g). (ECF No. 1.) Plaintiff does not appeal the final decision denying her application for SSI pursuant to 42 U.S.C. § 1383(c)(3). (*See id.*) On September 15, 2025, Plaintiff filed her motion brief pursuant to Supplemental Rule 6 for

---

[1] The administrative record is set forth in this transcript. (*See generally* ECF No. 5.)

Social Security Actions under 42 U.S.C. § 405(g). (ECF Nos. 7, 8.) The Commissioner filed an Opposition on November 19, 2025 (ECF No. 11), and Plaintiff filed a Reply on December 3, 2025 (ECF No. 12).

      **B.**      **Factual Background**

          **1.**      **Plaintiff's History**

Plaintiff is forty-five years old. (Tr. at 55, 75.) She has a high school diploma and previously worked as a self-employed hairdresser. (Tr. at 55, 75.) Plaintiff allegedly suffers from the following impairments: morbid obesity, bilateral tarsal tunnel syndrome and plantar nerve lesions, left knee arthritis, low back pain, headaches, hypertension, kidney disease, depression and anxiety. (Tr. at 51.) Plaintiff is approximately 5'5" and her weight was within the range of 287 to 297 between January 20 and November 28, 2023.[2] (*Compare* Tr. at 767, *with* Tr. at 808.) Her treating physicians have routinely advised her to lose weight through diet and exercise (*see, e.g.*, Tr. at 397, 457, 799), which would assist in treating her other impairments (*see, e.g.*, Tr. at 624–25 (advising her to lose weight to reduce headaches); Tr. at 652 (advising her to lose weight to reduce stress on her left knee)). Plaintiff has not been provided with any treatment or prescribed any medications for her morbid obesity. (*See generally* Tr.)

Plaintiff has a history of bilateral chronic pain and swelling in her feet. (Tr. at 51, 76–78, 96.) She previously underwent a right foot vein removal in 2015 and 2017. (Tr. at 780.) On January 3, 2022, Plaintiff followed up with Advanced Care Foot and Ankle regarding burning pain and

---

[2] Plaintiff's weight fluctuates widely between medical records. For example, the medical records of Dr. Levine suggest her weight was within the range of 287 to 297 pounds between January 20 and November 28, 2023 (Tr. at 767, 808), whereas the records of Dr. Kapoor suggest her weight was consistently 165.35 pounds between same (Tr. at 599, 623). The Court finds the measurements of Dr. Levine to be consistent with the other measurements in the record. (*See* Tr. at 91, 257, 369, 462, 486, 534, 564, 703, 736, 820-21.)

numbness on the medial side of her left hindfoot, which had been diagnosed as bilateral tarsal tunnel syndrome and plantar nerve lesions. (Tr. at 372; *see also* Tr. at 438 (claiming she was diagnosed with tendon dysfunction).) Plaintiff rated the pain at 7/10 and claims the pain is exacerbated by standing and walking, and relieved by sitting and resting. (Tr. at 372; *accord* Tr. at 431–32.) The record notes Plaintiff has previously undergone injections, physical therapy, and nerve destruction without relief. (Tr. at 372.) On April 25, 2022, Plaintiff reported similar pain and numbness at the bottom of her heels, which first started approximately two weeks earlier (Tr. at 384); and on August 17, 2022, she reported similar pain and numbness on the medial side of her right hindfoot, which first started approximately two months earlier (Tr. at 411). She rated her pain at 7/10. (Tr. at 384.) Between September and December 2022, Plaintiff underwent additional injections, physical therapy, and nerve destruction procedures. (Tr. at 397.) Plaintiff claims she ultimately underwent six surgeries in her feet, including the installation of implants in both feet. (Tr. at 438, 462, 463, 736–37; *see also* Tr. at 82–83 (stating two implants were installed in the right foot and one in the left foot).) She testified she presently receives monthly injections in her feet and utilizes "a brace on her right foot and ankle sleeves on both feet to assist with managing the pain." (Tr. at 83–84, 147, 438.)

On August 28, 2023, Plaintiff fell and injured her left knee, which has resulted in pain, weakness, and loss of balance. (Tr. at 56, 110, 615, 649.) Plaintiff also alleges she suffers from low back pain as a result of her fall. (Tr. at 51.) She subsequently underwent x-rays of the left knee showing no fractures or dislocations but indicating "[s]ignificant medial joint space narrowing[,] [g]lobal osteophytes[,] [and] [a]rthritis." (Tr. at 651.) She underwent an MRI of the left knee indicating "an extruded tear of the medial meniscus and full-thickness cartilage loss in the medial aspect of her knee and tricompartmental arthritis." (Tr. at 649.) She was ultimately diagnosed with

4

unilateral primary osteoarthritis associated with her morbid obesity. (Tr. at 649.) She initially rated the pain in her left knee as 4/10, which subsequently worsened to 7/10. (Tr. at 649, 651.) On August 29, 2023, she received a cortisone injection in the left knee without improvement. (Tr. at 651, 661.) She received physical therapy for pain and weakness in both her left knee and lower back with minimal improvement between December 4, 2023, and February 5, 2024. (Tr. at 749–65; *see also* Tr. at 766–69.) Between January 30 and February 13, 2024, she received three Euflexxa intra-articular viscosupplementation injections without improvement.[3] (Tr. at 649, 663. *But see* Tr. at 659 (reporting minor improvement between second and third Euflexxa injection).) She was scheduled for a second cortisone injection in March 2024 (Tr. at 663), but the records do not indicate whether she ultimately received same (*see generally* Tr.). Plaintiff was advised an arthroscopic surgery would provide no clinical utility and, if anything, may worsen her condition. (Tr. at 649.) Although she will ultimately be required to undergo knee replacement surgery, her treating physicians have not recommended it at this time based on her age. (*See* Tr. at 649.) The record does not include any complaints, findings, or treatment relating to the alleged lower back pain after December 4, 2023. (*See generally* Tr.)

Plaintiff claims she suffers diffuse, throbbing pressure headaches. (Tr. at 82.) She first reported the headaches in or about August 2021, which she described as "starting behind both eyes [and] radiating throughout the whole head." (Tr. at 620.) At the time, papilledema was observed. (Tr. at 620.) On November 13, 2021, Plaintiff underwent a transcranial doppler, which "showed no evidence of an[] intracranial stenosis or cerebral vasospasm." (Tr. at 620.) On September 8, 2022, she underwent an electroencephalogram, the results of which were normal. (Tr. at 620.) On

---

[3]   ALJ Pantuso mistakenly states Plaintiff received the Euflexxa intra-articular viscosupplementation injections in February 2014. (Tr. at 56.)

December 7, 2022, she underwent an MRI of the brain, which showed a normal brain and intact optic nerves. (Tr. at 620.) Plaintiff was ultimately diagnosed with "secondary pseudotumor cerebri with underlying migraine component." (Tr. at 625.) She was advised to lose weight and prescribed medication for her headaches, which reduced but did not eliminate both the intensity and frequency of same. (Tr. at 621, 624–25.)

Plaintiff also claims she suffers from hypertension, status post-ovarian cystectomy, and kidney disease. (Tr. at 51.) First, the record establishes Plaintiff was in fact diagnosed with benign hypertension.[4] (*See, e.g.*, Tr. at 766–69.) The record also shows she was prescribed Amlodipine and Losartan in response to same prior to January 20, 2023. (*See* Tr. at 259, 356, 438, 501, 820. *But see* Tr. at 51 (claiming Plaintiff was not prescribed any blood pressure medications).) On April 26, 2023, Howard S. Levine, DO, noted her blood pressure was "well managed." (Tr. at 795.) Next, Plaintiff underwent a laparoscopic ovarian cystectomy on June 13, 2023. (Tr. at 480–595.) On June 30, 2023, Dr. Levine reported the laparoscopic ovarian cystectomy went well. (Tr. at 787–90.) Finally, Dr. Levine diagnosed Plaintiff with a "little bit" of renal insufficiency based on a blood urea nitrogen ("BUN") test and glomerular filtration rate ("GFR") test, which indicated a creatine level of 1.10.13 over normal on November 28, 2023. (Tr. at 766.) The record does not include any further complaints, findings, or treatment relating to hypertension, status post-ovarian cystectomy, or kidney disease. (*See generally* Tr.)

---

[4] Plaintiff's blood pressure readings fluctuate widely between medical records. For example, the medical records of Dr. Levine suggest her blood pressure was within the ranges of 98 to 130/66 to 84 between January 20 and November 28, 2023 (Tr. at 767, 771, 775, 781, 785, 788, 792, 796, 800, 804, 808), whereas the records of Dr. Kapoor suggest her blood pressured was within 122/70 to 72 between January 20 and December 8, 2023 (Tr. at 599, 605, 611, 617, 623).

Plaintiff has a history of anxiety and depression. (Tr. at 57, 78–80; *see also* Tr. at 151 (reporting anxiety, depression, suicidal intentions, and post-traumatic stress disorder).) Plaintiff claims she was first diagnosed with anxiety and depression following the death of her son's father in 2007,[5] which was worsened following the death of her youngest brother in 2021. (Tr. at 454–55, 706.) She was previously admitted for suicidal intentions three times in a single year. (Tr. at 454.) Plaintiff received psychiatric care and was prescribed medication for her anxiety and depression until her psychiatrist moved in 2021. (Tr. at 368.) Following same, she did not seek additional psychiatric care as her primary care physician prescribed the necessary medications. (Tr. at 259, 368; *see also* Tr. at 795 ("Plaintiff has a history of depression, but it is well controlled.").) However, Plaintiff claims her anxiety and depression worsened after retiring as a hair stylist. (Tr. at 81–82, 449, 453–54, 819.) Plaintiff began to experience sleeplessness because the "[b]ills [were] piling, and shut off notices [were] stressing [her] out," which the medications did not alleviate. (Tr. at 449, 453; *see also* 466, 703–04 (identifying the primary cause of her anxiety and depression as her inability to sleep).) On September 13, 2023, Plaintiff sought additional psychiatric care reporting "her anxiety and depression have become a bit hard to control by herself." (Tr. at 819–20.) At the time, she rated her depression as 8/10. (Tr. at 821. *But see* Tr. at 820 (assessing "no signs of depression or elevation").) On January 9, 2024, Plaintiff was diagnosed with general anxiety and major depression, recurrent moderate. (Tr. at 704; *see also* Tr. at 710 (describing the impairment as moderate due to depression and grief).)

The record establishes Plaintiff did not engage in substantial gainful activity since she retired as a hair stylist on January 1, 2023. (Tr. at 51.)

---

[5] The record is not clear whether the son's father passed away in 2007 or 2017. (*Compare* Tr. at 454, *with* Tr. at 723.)

### 2.    Administrative History

On July 5, 2023, Ashraf K. Faltas, M.D., conducted a consultative examination. (Tr. at 366–69.) At the time, Plaintiff reported a history of hypertension (2.5 years), bilateral chronic pain and swelling in her feet (6 years), and anxiety and depression (9 years). (Tr. at 368.) Plaintiff claimed she had undergone three surgeries relating to the constant pain in her feet and took medication for her anxiety and depression, which was prescribed by her primary care physician. (Tr. at 368.) "[S]he ha[d] not seen a psychiatrist in approximately [five] years." (Tr. at 368.) However, when asked to elaborate further, Plaintiff became "belligerent" and "extremely aggressive." (Tr. at 368.) Dr. Faltas conducted a physical examination and noted Plaintiff was "[u]ncooperative with range of motion." (Tr. at 369.) Dr. Faltas observed an "[a]brasion over [her] right foot and ankle" but otherwise reported neither a sensory nor motor deficit, and normal deep tendon reflexes, strength, and gait and gross manipulation. (*See* Tr. at 369.) Dr. Faltas noted Plaintiff "was able to get on and off the examination table without any assistance and without the use of any devices." (Tr. at 369.)

On July 13, 2023, Ashley Appleton, Psy.D., completed a psychiatric examination. (Tr. at 438–42.) Plaintiff reported a history of anxiety and depression. (*See* Tr. at 439.) Specifically, Plaintiff claimed she is usually "irritable" and experiences "excessive worry" due to "her financial stability, her children's well-being[,] and her overall health," which has resulted in her loss of interest in activities. (*See* Tr. at 439.) She also claimed she suffers from frequent tearfulness and panic attacks "at least three times a day," and has difficulty concentrating and sleeping more than three hours at night. (*See* Tr. at 439.) Plaintiff denied suffering from "hallucinations, delusions, paranois[,] or phobias." (Tr. at 439.) Although she prefers assistance due to the risk of falling, Plaintiff reported she was capable of "her own grooming, bathing[,] and dressing." (Tr. at 441.) Plaintiff claimed she is unable to perform household chores but is capable of managing her own

8

money and traveling independently. (Tr. at 441; *see also* Tr. at 438 (stating Plaintiff arrived at the psychiatric examination on her own).) Dr. Appleton described Plaintiff as cooperative, oriented, and focused. (*See* Tr. at 440.) Furthermore, Dr. Appleton noted Plaintiff had normal short- and long-term memory and was capable of engaging in organized thought process, simple calculations, and recall activities. (*See* Tr. at 440–41.) Dr. Appleton diagnosed Plaintiff with a generalized anxiety disorder and a major depressive disorder. (Tr. at 441.) Dr. Appleton opined Plaintiff "is able to follow and understand simple directions and instructions" and "to perform simple tasks." (Tr. at 441.) However, due to her difficulty concentrating and frequent panic attacks, Plaintiff "may have difficulty learning new tasks and performing complex tasks." (Tr. at 441.) Dr. Appleton concluded Plaintiff's anxiety and depression "may significantly interfere with [Plaintiff]'s ability to function on a daily basis." (Tr. at 441.)

On April 11, 2024, ALJ Pantuso conducted a hearing, which was attended by vocational expert Michael Smith. (Tr. at 70–90.) Smith provided classifications for Plaintiff's past work as a hair stylist, which he classified as light. (Tr. at 85–86.) When asked by ALJ Pantuso what, if any, work a hypothetical individual could perform who is "limited to sedentary work; . . . occasionally balancing, stooping, crouching, crawling, and kneeling; able to perform simple work in a low stress work environment defined as no contact with the general public, little decision making, and few changes in the work setting," Smith opined such an individual could not work as a hair stylist but could work as a "ticket counter," a "polisher [of] eye glass frames," or a "table worker." (Tr. at 85.) However, Smith claimed such an individual could not maintain employment in any of these positions if he or she was regularly off task more "than 10% of the overall workday" or regularly absent "more than once a month." (Tr. at 87–88.)

9

In a written decision, dated May 17, 2024, ALJ Pantuso found Plaintiff was not disabled under the meaning of the Act beginning January 1, 2023. (Tr. at 45–65.) Consistent with the five-step sequential evaluation process for DIB benefits, *see infra* Section III, ALJ Pantuso determined Plaintiff has not been engaged in substantial gainful activity since January 1, 2023, and has the following severe impairments: "bilateral tarsal tunnel syndrome; bilateral plantar nerve lesions; left knee arthritis; headaches; hypertension; morbid obesity; depression disorder; and anxiety disorder." (Tr. at 51.) ALJ Pantuso also determined Plaintiff's "allegations of chronic kidney disease and low back pain are not associated with any medically determinable impairments." (Tr. at 51.) ALJ Pantuso found Plaintiff's severe impairments, both individual or in combination, did not meet or equal the severity of one of the list impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"). (*See* Tr. at 52–54.) Specifically, ALJ Pantuso determined the impairments most closely equated to Listing 1.18 (Abnormality of a Major Joint), 11.14 (Peripheral Neuropathies), 4.00 (Cardiovascular System), 12.04 (Depressive, Bipolar and Related Disorders), and 12.06 (Anxiety and Obsessive-Compulsive Disorders). (*See* Tr. at 52–53.) However, the impairments do not meet any of these listings as the evidence does not demonstrate: "chronic joint pain"; "stiffness with abnormal motion, instability, or immobility of the affected joint(s)"; or "impairment-related physical limitation of musculoskeletal functioning" (Listing 1.18); "disorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities" (Listing 11.14); "chronic heart failure, ischemic heart disease, recurrent arrhythmias, symptomatic congenital heart disease, heart transplant, aneurysm of the aorta or major branches, chronic venous insufficiency, or peripheral artery disease" (Listing 4.0); or "the inability to function independently, appropriately, or effectively, and on a sustained basis (Listings 12.04 &

12.06). (Tr. at 52–53.) ALJ Pantuso determined Plaintiff had a residual functional capacity ("RFC") capable of sedentary and simple work in a low-stress environment, "involving no contact with the general public, little decision-making, and few changes in the work setting." (Tr. at 54.) In support of same, ALJ Pantuso assigned no specific evidentiary weight to any prior medical findings or opinions. (Tr. at 57.) Based on her age, education, prior work experience, and RFC, ALJ Pantuso determined Plaintiff was incapable of performing her past work but was capable of performing other unskilled sedentary work relying upon Smith's testimony. (Tr. at 59–60.)

Following the written decision, Plaintiff filed an appeal with the Appeals Council, which included additional medical records not presented to ALJ Pantuso. (*See* Tr. at 8.) Some of these records were dated prior to the issuance of the written decision on May 17, 2024 (the "Unpresented Prior Records"), and some were dated post same (the "Post Records"). (*See* Tr. at 8.) In response, the Appeals Council reviewed the additional prior medical records finding the records "would [not] change the outcome of the decision." (Tr. at 8.) However, the Appeals Council did not review the additional Post Records as these records "do[] not relate to the period at issue." (Tr. at 8.) The Appeals Council advised Plaintiff the additional Post Records would be considered in a subsequent application for DIB "beginning on or before May 17, 2024." (Tr. at 8.)

## II.    STANDARD OF REVIEW

When reviewing a final decision of the Commissioner, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive by a reviewing court if supported by "substantial evidence" in the record. 42 U.S.C. § 405(g); *see Knepp*

11

*v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). A district court must affirm an ALJ's decision if it is supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *Newhouse v. Heckler*, 753 F.2d 283, 285 (3d Cir. 1985) (citations omitted). Substantial evidence "is more than a mere scintilla of evidence but may be less than a preponderance." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545 (3d Cir. 2003). The Supreme Court reaffirmed this understanding of the substantial evidence standard in *Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019). To determine whether an ALJ's decision is supported by substantial evidence, a court must review the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984). "Courts are not permitted to re-weigh the evidence or impose their own factual determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011). Accordingly, a court may not set an ALJ's "decision aside if it is supported by substantial evidence, even if [it] would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).

## III.    THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

Under the Act, the SSA is authorized to pay SSI and DIB to "disabled" persons. 42 U.S.C. § 1382(a). A person is "disabled" if "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A person is unable to engage in substantial gainful activity only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national

economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. 42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated under the Act establish a five-step process for determining whether a claimant is disabled for purposes of SSI and DIB. 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown he or she is not currently engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), (b); *see Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *Id.* Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his or her physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c); *see Bowen*, 482 U.S. at 140–41. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1522(b). These activities include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

*Id.* A claimant who does not have a severe impairment is not considered disabled. 20 C.F.R. § 404.1520(c); *see Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).

Third, if a claimant's impairment(s) is found to be severe, the ALJ then determines whether the impairment(s) meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates

his or her impairment(s) is equal in severity to, or meets, one of the impairments on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See* 20 C.F.R. § 404.1520(d); *see also Bowen*, 482 U.S. at 141. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526. If there is more than one impairment, then the ALJ must consider whether the combination of impairments equals any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992).

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the RFC to perform his or her past relevant work. 20 C.F.R. §§ 404.1520(e), (f); *Bowen*, 482 U.S. at 141. Step four involves three sub-steps:

> (1) the ALJ must make specific findings of fact as to the claimant's [RFC]; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the [RFC] to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

*Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 120 (3d Cir. 2000) (citations omitted). When determining RFC, an ALJ's consideration of medical opinion evidence is subject to the framework articulated in 20 C.F.R. § 404.1527 (for claims filed before March 27, 2017) or 20 C.F.R. § 404.1520c (for claims filed after March 27, 2017).

Claimants are not disabled if their RFC allows them to perform their past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), (f). However, if the claimant's RFC prevents him or her from

doing so, or if the claimant has no past relevant work, an ALJ proceeds to the fifth and final step of the process. 20 C.F.R. § 404.1520(a)(4)(g). The final step requires the ALJ to "show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with [his or] her medical impairments, age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428; 20 C.F.R. § 404.1520(a)(4)(v). In doing so, "[t]he ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled." *Plummer*, 186 F.3d at 428; 20 C.F.R. § 404.1523. An ALJ typically seeks the assistance of a vocational expert at this final step. *Plummer*, 186 F.3d at 428.

The claimant bears the burden of proof for steps one, two, and four. *Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000). Neither side bears the burden of proof for step three "[b]ecause step three involves a conclusive presumption based on the listings." *Id.* at 263 n.2; *see Bowen*, 482 U.S. at 146 n.5. An ALJ bears the burden of proof for step five. *Sykes*, 228 F.3d at 263.

On appeal, the harmless error doctrine requires a plaintiff to show, as to the first four steps: (1) an error occurred; and (2) but for that error, they might have proven their disability. *Holloman v. Comm'r of Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016). In other words, when reviewing an appeal based on the first four steps, a court considers whether the plaintiff articulated a basis for a decision in their favor, based on the existing record. If the plaintiff cannot, it is unlikely they will meet their burden of showing an error was harmful. *See, e.g.*, *Lippincott v. Comm'r of Soc. Sec.*, 982 F. Supp. 2d 358, 380–81 (D.N.J. 2013) (finding ALJ's error was harmless); *Powers v. Comm'r of Soc. Sec.*, Civ. A. No. 19–21970, 2021 WL 1207793, at *7 (D.N.J. Mar. 31, 2021) (finding the plaintiff had not demonstrated she was prejudiced by the ALJ's decision and had not shown an error occurred amounting to harm).

15

The court's review of legal issues within this appeal is plenary. *See Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). Factual findings are reviewed "only to determine whether the administrative record contains substantial evidence supporting the findings." *Sykes*, 228 F.3d at 262. Substantial evidence is "less than a preponderance of the evidence but more than a mere scintilla." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citation omitted). Substantial evidence also "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation and internal quotation marks omitted). When substantial evidence exists to support the Commissioner's factual findings, this Court must abide by those determinations. *See id.* (citing *Schaudeck*, 181 F.3d at 431); 42 U.S.C. § 405(g).

## IV.    DECISION

Plaintiff appeals the Commissioner's decision and requests the Court to reverse the decision pursuant to sentence four of 42 U.S.C. § 405(g) and find Plaintiff is entitled to a period of disability beginning on January 1, 2023. (ECF No. 1; *accord* ECF No. 8.) Plaintiff challenges the Appeals Council decision not to review the additional Post Records as these records do not relate to the relevant time period. (ECF No. 8 at 24–26.) Plaintiff also challenges the following determinations: (a) the determination her chronic kidney disease is not associated with a medically determinable impairment at step two (*id.* at 26–28); (b) the determination her severe impairments, both individually or in combination, did not meet or equal the severity of one of the Listed impairments at step three (*id.* at 38–41); (c) the determination Plaintiff has the RFC necessary to perform sedentary work at step four (*id.* at 28–37, 41–44); and (d) the determination there are jobs in significant numbers she can perform in the economy at step five (*id.* at 37–38). The Court reviews each argument in turn.

16

### A.    Plaintiff's Challenge to the Appeals Council's Determination

Pursuant to sentence six of 42 U.S.C. § 405(g), the Court has the authority to remand a matter for further proceedings based on additional evidence not considered by the ALJ if the evidence is new, material, and there exists "good cause why it was not previously presented to the ALJ." *Levyash v. Colvin*, Civ. A. No. 16-2189, 2018 WL 1559769, at *13 (D.N.J. Mar. 30, 2018) (quoting *Matthews*, 239 F.3d at 592); *see also Haney v. Comm'r of Soc. Sec.*, Civ. A. No. 13-3033, 2014 WL 2916454, at *15 (D.N.J. June 26, 2014) ("[C]ourts have recognized that Congress intended this aspect of § 405(g) to be sparingly applied."). Evidence is new if it was not available at the time of the proceeding and is material if it is relevant, probative, and reasonably possible to have altered the outcome of the determination. *Bettuccio v. Colvin*, Civ. A. No. 12-1512, 2013 WL 3188165, at *17 (W.D. Pa. June 21, 2013). Evidence is not material, however, "if it [only] relate[s] to the time period for which benefits were denied and does not concern the subsequent deterioration of the previously non-disabling condition." *Levyash*, 2018 WL 1559769, at *13 (second alteration in original) (internal quotation marks omitted) (quoting *Lisnichy v. Comm'r of Soc. Sec.*, 599 F. App'x 427, 429 (3d Cir. 2015)); *see also Hanson v. Astrue*, Civ. A. No. 12–084, 2013 WL 1631389, at *9 (W.D. Pa. Apr. 16, 2013) (declining to remand case for new evidence as "[w]hile all of the records submitted to the Appeals Council are 'new' in the sense that they post-date the ALJ's decision, these records are immaterial since they do not relate to the time period for which benefits were denied").

Establishing "good cause" requires a claimant to demonstrate "some justification for the failure to acquire and present such evidence to the [ALJ]." *Donna F. v. O'Malley*, Civ. A. No. 22-2503, 2024 WL 3755891, at *18 (D.N.J. Aug. 12, 2024) (quoting *Szubak v. Sec'y of Health & Hum. Servs.*, 745 F.2d 831, 833 (3d Cir. 1984)). The Third Circuit has recognized a claimant

17

"should generally be afforded only one fair opportunity to demonstrate eligibility for benefits under any one set of circumstances." *Szubak*, 745 F.2d at 834; *accord E.E.O.C. v. Westinghouse Elec. Corp.*, 925 F.2d 619, 631 (3d Cir. 1991); *Lourenco v. Kijakazi*, Civ. A. No. 21-6732, 2022 WL 1683840, at *9 (D.N.J. May 26, 2022). Therefore, to demonstrate "good cause" exists, a claimant is required to "provide a logical reason [as to] why the proffered additional evidence was not, or could not have been, presented to the [ALJ] for inclusion in the record during the administrative proceedings." *Haney*, 2014 WL 2916454, at *15 (internal quotation marks omitted); *see also Szukak*, 745 F.2d at 834 ("A claimant might be tempted to withhold medical reports, or refrain from introducing all relevant evidence, with the idea of obtaining another bite of the apple if the [ALJ] decides that the claimant is not disabled."). Courts "have routinely rejected a change in attorney representation between the hearing and the appeal, without more, as providing good cause to supplement under § 405(g)." *Haney*, 2014 WL 2916454, at *15; *see also Jaclyn N. v. Bisignano*, Civ. A. No. 23-22456, 2025 WL 3101691, at *14 (D.N.J. Nov. 6, 2025) ("[N]either current counsel's implicit differing legal strategy nor former counsel's suggested negligence establishes the necessary good cause."); *Lyons v. Berryhill*, Civ. A. No. 18-1106, 2019 WL 4094701, at *1 (W.D. Pa. Aug. 29, 2019) (holding it was the plaintiff's obligation "to present her best case to the ALJ, not to wait to see whether she liked his decision to decide whether to submit rebuttal evidence. Such 'sand-bagging' does not constitute good cause.").

Here, Plaintiff challenges the Appeals Council decision to reject the Unpresented Prior Records as the records do "not show a reasonable probability that [they] would change the outcome" and the Post Records as the records do "not relate to the period at issue." (ECF No. 8 at 24–26 (quoting Tr. at 8).) The Commissioner argues the Appeals Council was not required to remand the determination for additional administrative proceedings as Plaintiff failed to

18

demonstrate the Post Records are new and material, and there exists good cause for having failed to present same during the prior administrative proceeding under sentence six of 42 U.S.C. § 405(g). In response, Plaintiff claims the Post Records are new "as it was not in the record before," and material as "it reasonably relates to the relevant time period," and that good cause exists as she "was represented by a non-attorney representative prior to the hearing and after the hearing she retained [an] [a]ttorney." (ECF No. 12 at 5–8.)

The Appeals Council did not err in rejecting the Unpresented Prior Records, as the records are not "new," *i.e.*, not available at the time of the proceeding. *See Bettuccio*, 2013 WL 3188165, at *17. Nor did the Appeals Council err in rejecting the Post Records. Regardless of whether the Post Records are "new" or "material," Plaintiff has not demonstrated "good cause" exists for failing to present these records to the ALJ. *Haney*, 2014 WL 2916454, at *15. Plaintiff's sole argument in support of her claim "good cause" exists is that her representation has changed from a non-attorney representative to an attorney representative. (*See* ECF No. 12 at 6–7.) However, the courts have routinely held that such a change in representation is sufficient to demonstrate good cause for remand. *See Haney*, 2014 WL 2916454, at *15; *see also Donna F.*, 2024 WL 3755891, at *19 (holding the failure of a non-represented plaintiff to present records to the ALJ did not constitute good cause); *Simonson v. Berryhill*, Civ. A. No. 16-631, 2017 WL 5632691, at *3 (M.D. Pa. Nov. 22, 2017) (holding "change in representation from a non-attorney representative at the administrative stage to an attorney representative before the [D]istrict [C]ourt . . . . did not constitute good cause").

The record establishes Plaintiff had non-attorney representation prior to the administrative hearing and was represented by counsel at the hearing, Rafi Issagholian, Esq. (*See* Tr. at 70, 137–143.) ALJ Pantuso questioned Issagholian if he had an opportunity to review the record, and

19

Issagholian confirmed he had, stating the record is closed. (*See* Tr. at 74–75.) Based on this, Plaintiff cannot demonstrate a sufficient justification for failing to hold the record open so as to acquire and present the Post Records to the ALJ. *See Donna F.*, 2024 WL 3755891, at \*19; *see also Matos v. Kijakazi*, Civ. A. No. 21-2024, 2022 WL 1134995, at \*8 (D.N.J. Apr. 18, 2022) ("Ultimately, Plaintiff's good cause argument appears to boil down to either that current counsel disagrees with prior counsel's legal strategy to not obtain Dr. Paris's report, or that prior counsel was somehow negligent. Neither reason is adequate justification for submitting new evidence, and, in turn, is not good cause.").

Accordingly, the Court finds the Appeals Council's decision to reject the Unpresented Prior Records and post-records was not an error as Plaintiff cannot establish the records are "new," "material," and "good cause" exists as to why the additional records were not presented to ALJ Pantuso.

### B.    Plaintiff's Challenge to ALJ Pantuso's Step Two Determination

During step two, the ALJ considers whether a claimant has demonstrated a "severe medically determinable physical or mental impairment" that significantly limits his or her physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c); *see Bowen*, 482 U.S. at 140–41. The step two determination "is a *de minimis* screening device to dispose of groundless claims," *Newell*, 347 F.3d at 546, which requires the ALJ to consider each and every impairment the claimant or the record has identified, both individually and in combination. *See Vanessa T-H. v. Comm'r of Soc. Sec.*, Civ. A. No. 23-2293, 2024 WL 1635685, at \*4 (D.N.J. Apr. 16, 2024) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)); *see also* 20 C.F.R. § 404.1512(a)(1) ("[The SSA] will consider only impairment(s) [the claimant] say[s] [she] ha[s] or about which [it] receive[s] evidence."). If the claimant demonstrates "something beyond a slight

20

abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work," *Corradina S. v. Bisignano*, Civ. A. No. 23-3121, 2025 WL 1902590, at *7 (D.N.J. July 10, 2025) (internal quotation marks omitted) (quoting *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004)), then the evaluation proceeds to the next step, *Gbur v. Kijakazi*, Civ. A. No. 21-863, 2023 WL 8456134, at *5–6 n.1 (M.D. Pa. Dec. 6, 2023) (citing 20 C.F.R. § 404.1520(a)(4)(ii)–(iii)). Therefore, as step two exists to screen groundless claims with no severe complaints, courts have consistently held if the ALJ finds the claimant has demonstrated at least one severe impairment and continues the evaluation onto the next step, the failure to identify another condition as severe is typically a harmless error. *See Friday v. Comm'r of Soc. Sec.*, Civ. A. No. 20-4504, 2021 WL 3879081, at *4 (D.N.J. Aug. 31, 2021); *Crawford v. Comm'r of Soc. Sec.*, Civ. A. No. 13-5500, 2015 WL 1003864, at *4 (D.N.J. Mar. 5, 2015).

However, an ALJ need not consider medical impairments which are not "medically determinable." *See Willistine S. v. Comm'r of Soc. Sec.*, Civ. A. No. 20-5501, 2021 WL 4452491, at *6 n.14 (D.N.J. Sept. 29, 2021) ("[A]n ALJ does not have to consider an alleged impairment if he does not find such an impairment is medically determinable." (quoting *Diciano v. Commissioner of Social Security*, Civ. A. No. 18-17383, 2019 WL 6696523, at *4 (D.N.J. 2019)). A medically determinable impairment is an impairment that can be demonstrated by objective medical evidence gathered through "acceptable clinical and laboratory diagnostic techniques." *Nicholas M. v. O'Malley*, Civ. A. No. 23-22121, 2024 WL 4319579, at *4 (D.N.J. Sept. 26, 2024) (citing 42 U.S.C. § 423(d)(3)); "[A]n ALJ will not use a claimant's statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment." *Corradina S.*, 2025 WL 1902590, at *7 (internal quotation marks omitted) (quoting 20 C.F.R. §§ 404.1521, 416.921).

21

Here, Plaintiff challenges ALJ Pantuso's step two determination that her chronic kidney disease is a non-severe impairment not associated with a medically determinable impairment.[6] (ECF No. 8 at 26–28.) Specifically, Plaintiff argues the record contains more than the required *de minimis* level of evidence necessary to establish the impairment under step two. (*Id.* at 27.) In response, the Commissioner concedes the record establishes Plaintiff has "a bit [of] renal insufficiency," but argues the record fails to demonstrate the impairment "significantly limited her ability to basic work activities." (ECF No. 11 at 9 (alteration in original) (quoting Tr. at 766).) Alternatively, the Commissioner claims even if the record demonstrates the chronic kidney disease was a severe impairment, the error was harmless. (*See id.*)

ALJ Pantuso did not err in determining that the alleged impairment of chronic kidney disease is not medically determinable. As noted by ALJ Pantuso, "the record does not include a related diagnosis from an acceptable medical source for [chronic kidney disease]." (Tr. at 51; *see also* Tr. at 505 (indicating no medical condition relating to her kidneys as of June 13, 2023).) On November 28, 2023, Plaintiff reported to Dr. Levine that "her cardiologist told her that she had kidney failure and needed dialysis." (Tr. at 766.) The record does not identify the alleged cardiologist who advised Plaintiff she had kidney failure and required dialysis. (*See generally* Tr.) Regardless, the record clearly reflects Dr. Levine reviewed her labs, which indicated a normal blood urea nitrogen ("BUN") level, a normal glomerular filtration rate ("GFR"), and a creatine of only 1.10.13 over normal, and advised Plaintiff due to her pain management medications and eating habits her "kidney functions [with] a little bit renal insufficiency." (Tr. at 766.) The record

---

[6] Plaintiff does not dispute ALJ Pantuso's step two determination that her alleged status post-laparoscopic ovarian cystectomy and lower back pain were non-severe impairments not associated with a medically determinable impairment. (*Compare* Tr. at 51, *with generally* ECF No. 8.)

does not suggest Dr. Levine, or any other physician, diagnosed Plaintiff with chronic kidney disease. (*See generally* Tr.)

Accordingly, the Court finds ALJ Pantuso's determination that Plaintiff's chronic kidney disease was not a medically determinable impairment is supported by substantial evidence in the record and, as such, remand for further administrative proceedings at step two is not warranted.

### C.      Plaintiff's Challenge to ALJ Pantuso's Step Three Determination

During step three, the ALJ compares the medical evidence of a claimant's impairments with the Impairments List in 20 C.F.R. Part 404, Subpart P, Appendix 1, which are presumed severe enough to preclude any gainful work. *See Holley v. Colvin*, 975 F. Supp. 2d 467, 476 (D.N.J. 2013), *aff'd*, 590 F. App'x 167 (3d Cir. 2014). The entries in the Impairments List are descriptions of various physical and mental illnesses and abnormalities, categorized by the body system they affect. *Sullivan v. Zebley*, 493 U.S. 521, 529–30 (1990). All impairments are defined "in terms of several specific medical signs, symptoms, or laboratory test results." *Id.* at 530. "If a claimant's impairment meets or equals one of the listed impairments, he will be found disabled. . . . If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to step four." *Holley*, 975 F. Supp. 2d at 476. To be found disabled, however, the claimant "must present medical findings equal in severity to all the criteria for the one most similar listed impairment." *Sullivan*, 493 U.S. at 531.

"For a claimant to show that his [or her] impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.*; *see* SSR 83–19, Dep't of Health & Human Servs. Rulings 90 (Jan. 1983) ("An impairment 'meets' a listed condition . . . only when it manifests the specific findings described in the set of medical criteria for that listed impairment."); 20 C.F.R.

23

§ 416.926(a) (1989) (noting claimant's impairment is "equivalent" to listed impairment if the medical findings are "at least equal in severity and duration to the criteria of any listed impairment"). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his [or her] unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan*, 493 U.S. at 531–32.

To conclude an applicant is not disabled under the step three analysis, the ALJ must "set forth the reasons for his [or her] decision." *Burnett*, 220 F.3d at 119 (remanding where ALJ made only conclusory statements without mentioning any specific listed impairments or explaining reasoning). Conclusory statements have been found to be "beyond meaningful judicial review." *Cotter v. Harris*, 642 F.2d 700, 704–05 (3d Cir. 1981). As the Third Circuit has explained, the ALJ is not required to "use particular language or adhere to a particular format in conducting his [or her] analysis . . . . [but must] ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." *Jones*, 364 F.3d at 505. The ALJ satisfies this standard by "clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant Listing." *Scatorchia v. Comm'r of Soc. Sec.*, 137 F. App'x 468, 470–71 (3d Cir. 2005).

Although an ALJ's decision on step three need not address every minor piece of medical evidence in the record, the decision must meaningfully consider the elements of the listings and whether the weight of medical evidence presented shows a plaintiff meets these elements. *Ramazan K. v. Dudek*, Civ. A. No. 24–6138, 2025 WL 1720409, at *11 (D.N.J. June 20, 2025). Conclusory statements that an impairment does not meet a certain listing are insufficient. *Compare Parrotta v. Kijakazi*, Civ. A. No. 21–13602, 2022 WL 2289554, at *9–11 (D.N.J. June 24, 2022), *and Rivera v. Saul*, Civ. A. No. 20–5308, 2021 WL 5122075, at *9–10 (D.N.J. Nov. 4, 2021)

24

(affirming ALJ step three determination evaluating specific symptoms included in listings and considering medical evidence to determine whether symptoms were met), *with Dance v. Comm'r of Soc. Sec.*, Civ. A. No. 20–3141, 2021 WL 3144696, at \*4–5 (D.N.J. July 26, 2021) (reversing ALJ step three determination that failed to specifically match proffered medical evidence to elements of relevant listing).

Plaintiff challenges ALJ Pantuso's step three determination that her severe impairments, both individual or in combination, did not meet or equal the severity of Listing 1.18 (Abnormality of a Major Joint), 12.04 (Depressive, Bipolar and Related Disorders), and 12.06 (Anxiety and Obsessive-Compulsive Disorders).[7] (ECF No. 8 at 38–41.) The Court addresses each in turn.

### 1.    Listing 1.18

Plaintiff argues ALJ Pantuso failed to sufficiently evaluate the record under Listing 1.18. (*Id.* at 39.) Listing 1.18 requires a claimant to demonstrate an "abnormality of a major joint(s) in any extremity" by documented: (a) "chronic joint pain or stiffness"; (b) "abnormal motion, instability, or immobility of the affected joint(s)"; (c) "anatomical abnormality of the affected joint(s)"; and (d) "impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.18. Listing 1.18 also requires medication documentation indicating:

---

[7] Plaintiff does not challenge ALJ Pantuso's step three determination her severe impairments did not meet or equal the severity of Listing 11.14 (Peripheral Neuropathies) and 4.00 (Cardiovascular System). (*See* Tr. at 52-53.)

> (1) A documented medical need for a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands; (2) An inability to use one upper extremity to independently initiate, sustain, and complete work- related activities involving fine and gross movements, and a documented medical need for a one- handed, hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand; or (3) An inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements.

*Id.* Based on the administrative record, ALJ Pantuso concluded Listing 1.18 is not met because the record does not demonstrate any of the required criteria. (*See* Tr. at 52.) ALJ Pantuso does not make specific findings pertaining to the criteria under step three. (*See* Tr. at 52–54.) However, she later reviewed and evaluated Plaintiff's complaints and supportive medical records under step four (*see* Tr. at 52–59), during which, ALJ Pantuso noted the record does not include a documented medical need for a walker or cane as required to meet Listing 1.18 (*see* Tr. at 55). Because Plaintiff has not alleged an inability to use an upper extremity, ALJ Pantuso did not make any findings relating to same. (*See generally* Tr. at 52–59.) "Reading the decision as a whole, [the Court] find[s] that the record and explanation of findings is developed enough to permit meaningful review . . . ." *Cosme v. Comm'r Soc. Sec.*, 845 F. App'x 128, 132 (3d Cir. 2021) (citing *Jones*, 364 F.3d at 505). Furthermore, regardless of whether the decision shows a meaningful consideration of the criteria of Listing 1.18, Plaintiff has failed to present a medical record presented to ALJ Pantuso showing a documented medical need for a walker or cane.[8] (*See generally* ECF No. 8 at 39); *Rebecca L. v. Comm'r of Soc. Sec.*, 617 F. Supp. 3d 256, 270 (D.N.J. 2022) (holding "[the] plaintiff

---

[8] In support of her argument ALJ Pantuso failed to sufficiently evaluate the record under Listing 1.18, Plaintiff cites to a prescription signed by Dr. Levine for a "shower bar" and "walker" dated August 25, 2023. (*See* ECF No. 8 at 39 (citing Tr. at 69).) The Court notes, however, the prescription was one of the Unpresented Prior Records. (*See* Tr. at 8.)

bears the burden to prove that an error by the ALJ was harmful" (citing *Holloman*, 639 F. App'x at 814)).

Accordingly, the Court finds ALJ Pantuso's determination that Plaintiff has not met Listing 1.18 is supported by substantial evidence in the record and, as such, remand for further administrative proceedings at step three is not warranted.

### 2.    Listing 12.04 and 12.06

Plaintiff argues ALJ Pantuso failed to appreciate the record evidencing the level of assistance she requires to care for and manage herself due to her irritability and inability to focus under Listings 12.04 and 12.06. (ECF No. 8 at 39–41.) Relevant to this appeal, Listings 12.04 and 12.06 require, in part, a claimant to demonstrate a marked limitation of two, or an extreme limitation of one, of the following areas of mental functioning: (1) understanding, remembering, or application of information; (2) interacting with others; (3) concentration, persistence, or maintaining pace; or (4) adapting or managing oneself.[9] *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(E). These areas "are evaluated in conjunction with a five-point scale (consisting of none, mild, moderate, marked, and extreme limitation)." *Morris v. Saul*, Civ. A. No. 19-1588, 2021 WL 3889555, at *10 (M.D. Pa. Jan. 4, 2021) (citing *id.* at § 12.00(A) & (F)). A claimant has a marked limitation if the claimant's ability to function "in this area independently, appropriately, effectively, and on a sustained basis is seriously limited," *id.* at § 12.00(F)(2)(d), and a claimant

---

[9] Alternatively, a claimant may demonstrate his or her mental disorder is "serous and persistent," *i.e.*, the claimant demonstrates over two years of medical documentation evidencing a history of a mental disorder and evidence of both: (1) ongoing medical treatment—"[m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s)," which "diminishes the symptoms and signs of [the] mental disorder"; and (2) marginal adjustment—"[the] minimal capacity to adapt to changes in [an] environment or to demands that are not already of [the claimant's] daily life." *Id.* at § 12.00(G)(2)(b), (c). Plaintiff does not argue the record demonstrates over two years of medical documentation evidence a history of a mental disorder under Listings 12.04 or 12.06. (*See generally* ECF No. 8.)

has an extreme limitation if he or she is "not able to function in this area independently, appropriately, effectively, and on a sustained basis," *id.* at § 12.00(F)(2)(e). Based on the administrative record, ALJ Pantuso determined Plaintiff had a mild limitation under the third area (concentration, persistence, and maintaining pace) and moderate limitations under the first (understanding, remember, application of information), second (interacting with others), and fourth (adapting or managing oneself) areas. (*See* Tr. at 52–54.)

Plaintiff challenges ALJ Pantuso's evaluation of her limitations within the five-point scale. (*See* ECF No. 8 at 39–41.) Plaintiff does not argue the evaluation is not based on sufficient medical records in the administrative record under Listing 12.04 or 12.06, but rather claims ALJ Pantuso did not adequately consider Plaintiff's "anger," "irritability," "inappropriate interactions," "panic attacks," and required "level of assistance." (*See id.* at 39–41.) However, "this argument is essentially a request by Plaintiff for the Court to re-weigh the evidence in [her] favor, something the Court may not do." *J.M. v. Comm'r of Soc. Sec.*, Civ. A. No. 24-8438, 2025 WL 3312259, at *7 (D.N.J. Nov. 28, 2025); *see also Chandler*, 667 F.3d at 359 ("[C]ourts are not permitted to re-weigh the evidence or impose their own factual determinations.").

Accordingly, the Court finds ALJ Pantuso's determination that Plaintiff has not met Listing 12.04 or 12.06 is supported by substantial evidence in the record and, as such, remand for further administrative proceedings at step three is not warranted.

### D.    Plaintiff's Challenge to ALJ Pantuso's Step Four Determination

At step four in the disability determination process, an ALJ must assess the claimant's RFC and compare it to her past relevant work. 20 C.F.R. §§ 404.1520(e), (f); *Bowen*, 482 U.S. at 141. The claimant bears the burden of proof on step four, *see Sykes*, 228 F.3d at 263, including to present the facts necessary for the ALJ to assess the claimant's RFC, *see Bowen*, 482 U.S. at 146

28

n.5. On appeal, a claimant must show: (1) an error occurred; and (2) but for that error, she might have proven her disability. *See Holloman*, 639 F. App'x at 814. If a claimant believes an error was made, he "must clearly identify the error and explain how the error actually 'affect[ed] [his or her] "substantial rights."'" *Id.* at 814 n.3 (first alternation in original) (quoting *Shinseki*, 556 U.S. at 407).

In determining a claimant's RFC, the ALJ is required to consider all relevant medical evidence from acceptable sources and "may not make speculative inferences from medical reports." *Plummer*, 186 F.3d at 429. "Although the ALJ may weigh the credibility of the evidence," *Burnett*, 220 F.3d at 121, "the ALJ may not reject evidence for no reason or for the wrong reason," *Yensick v. Barnhart*, 245 F. App'x 176, 181 (3d Cir. 2007) (internal quotation marks omitted); *see also Plummer*, 186 F.3d at 429 ("[A]n ALJ is not free to employ [his or] her own expertise against that of a physician who presents competent medical evidence."). Rather, the ALJ "must give some indication of the evidence which he rejects and his [or her] reason(s) for discounting such evidence," *Burnett*, 220 F.3d at 121, pursuant to the framework articulated in 20 C.F.R. § 404.1520c. In evaluating the credibility of a medical opinion, the most important factors are its supportability and consistency with evidence from other sources. 20 C.F.R. § 404.1520c. Other relevant factors include, but are not limited to, whether the medical source received education or training in a relevant area of specialty, personally examined the claimant, or is familiar with the disability program's policies and requirements. 20 C.F.R. § 404.1520c(c)(3)(v), (4), (5).

In conducting an analysis of a claimant's obesity, an ALJ is not required to "use particular language or adhere to a particular format." *Shaver v. Bisignano*, Civ. A. No. 25-077, 2026 WL 594357, at *9 (M.D. Pa. Mar. 3, 2026) (quoting *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009)). Rather, so long as the ALJ meaningfully considered "the effect of a claimant's

obesity, individually and in combination with her impairments, on her workplace function at step three and at every subsequent step," remand is not required. *Id.* (quoting *Diaz*, 577 F.3d at 504); *see also Woodson v. Comm'r Soc. Sec.*, 661 F. App'x 762, 765 (3d Cir. 2016); *Cooper v. Comm'r of Soc. Sec.*, 563 F. App'x 904, 911 (3d Cir. 2014).

Here, Plaintiff challenges ALJ Pantuso's step four determination that she has an RFC to perform sedentary work. (ECF No. 8 at 28–37, 41–44.) Specifically, Plaintiff argues ALJ Pantuso: failed to rely on any expert in determining her RFC (*id.* at 36–37); failed to adequately afford controlling weight to the opinions of her treating physicians (*id.* at 28–32); and failed to consider or analyze her subjective complaints (*id.* at 41–43). Plaintiff also argues ALJ Pantuso failed to consider her morbid obesity in support of her step four determination. (*id.* at 32–33.) In response, the Commissioner argues ALJ Pantuso: was permitted to determine the RFC absent the support of an expert (ECF No. 11 at 17–18); afforded controlling weight to the opinion of Dr. Levine in support of the RFC (*id.* at 13–16); appropriately considered her morbid obesity (ECF No. 8 at 18–19); and appropriately considered her subjective complaints (ECF No. 11 at 19).

ALJ Pantuso determined Plaintiff had an RFC to perform "sedentary work" except that Plaintiff can "occasionally balance, stoop, crouch, crawl, and kneel." (Tr. at 54.) Therefore, ALJ Pantuso found Plaintiff "is limited to simple work in a low-stress environment, defined as involving no contact with the general public, little decision-making, and few changes in the work setting." (*Id.*) In support, ALJ Pantuso considered, in part, Plaintiff's subjective complaints, the records of her treating physicians, and the opinions of Dr. Appleton, Dr. Faltas, and Dr. Levine. (*See* Tr. at 54–59.) Notably, ALJ Pantuso found Dr. Appleton's opinion Plaintiff "had no limitation with simple tasks but had difficulty maintaining attention and concentration and may have difficulty learning new tasks and performing complex tasks" to be "persuasive." (Tr. at 58.) In

30

contrast, ALJ Pantuso found Dr. Faltas's opinion that Plaintiff has "retained [the] physical capacity for tasks such as activities of daily living despite her severe cardiovascular, foot/ankle, obesity, and neurological impairments" to only be "partially persuasive[] as they are less restrictive than indicated by the evidence as it relates to [her] capacity for exertional activity." (*Id.*) Similarly, ALJ Pantuso found Dr. Levine's opinion that Plaintiff "had moderate limitation with activities of daily living, social functioning, concentration, persistence, and pace" to only be "partially persuasive[] as it is internally inconsistent." (*See* Tr. at 58 (comparing the opinion to the medical record as a whole and Plaintiff's testimony).) Therefore, the record establishes ALJ Pantuso's RFC determination considered Plaintiff's subjective complaints, relied on the opinions of Dr. Appleton, Dr. Faltas, and Dr. Levine in support of the RFC determination, and afforded controlling weight to each opinion.

The record also establishes ALJ Pantuso sufficiently considered Plaintiff's morbid obesity in support of her RFC determination. ALJ Pantuso determined Plaintiff's morbid obesity to be a severe impairment at step two. (Tr. at 51.) Pursuant to SSR 19-2p, ALJ Pantuso then considered the impact the impairment has on her other impairments in determining whether the impairments equaled a listing under step three. (Tr. at 52.) In determining Plaintiff's RFC, ALJ Pantuso recounted the medical records documenting her morbid obesity during the relevant period, noting her BMI increased from 31.8 to 45.6 between January 2023 and February 2024. (Tr. at 56–57.) Therefore, the record establishes ALJ Pantuso considered Plaintiff's morbid obesity at each relevant step, including but not limited to in support of her RFC determination. *See Shaver*, 2026 WL 594357, at *9.

31

Accordingly, the Court finds ALJ Pantuso's determination that Plaintiff has an RFC to perform sedentary work is supported by substantial evidence in the record and, as such, remand for further administrative proceedings at step four is not warranted.

**E.    Plaintiff's Challenge to ALJ Pantuso's Step Five Determination**

During step five, an ALJ must "assess whether [the] claimant can return to past work or adjust to other work." *Ubaldini v. Comm'r Soc. Sec.*, No. 22-2686, 2023 WL 7001840, at *4 (3d Cir. Oct. 24, 2023). To assess same, the ALJ often relies "on the testimony of vocational experts and specialists." *Id.* (internal quotation marks omitted) (quoting *Zirnsak v. Colvin*, 777 F.3d 607, 612 (3d Cir. 2014)). Such testimony typically "centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert." *Zirnsak*, 777 F.3d at 614 (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)). Notably, the ALJ is not required to convey to the vocational expert each and every individual alleged impairment but rather is merely required to "accurately" convey the credibly established limitations as determined under step four. *See Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (quoting *Rutherford*, 399 F.3d at 554). "An ALJ's mere inclusion of certain alleged limitations among the hypothetical questions does not reflect the ALJ's acceptance that a claimant suffers from such limitations." *Ubaldini*, 2023 WL 7001840, at *4. An objection to the adequacy of the ALJ's hypothetical questions "often boil[s] down to [an] attack[] on the RFC assessment itself." *Cox v. Comm'r of Soc. Sec. Admin.*, Civ. A. No. 24-140, 2025 WL 2556573, at *5 (W.D. Pa. July 12, 2025) (quoting *Rutherford*, 399 F.3d at 554 n.8).

Here, Plaintiff challenges ALJ Pantuso's step five determination that there exist jobs in significant numbers, which she can perform. (ECF No. 8 at 37–38.) Specifically, Plaintiff argues ALJ Pantuso failed to consider whether there exists any jobs that would accommodate her walker,

her repeated absences due to medical appointments, and her repeated time off task. (*Id.* at 37–38.) In response, the Commissioner claims ALJ Pantuso was not required to consider whether there exists any such jobs as the alleged requirements of absences and time off task were merely hypothetical and not supported by the record. (ECF No. 11 at 20–21.)

Plaintiff does not challenge the accuracy of the ALJ's hypothetical questions but rather attempts to challenge the RFC determination under step five. (*See* ECF No. 8 at 37–38 (arguing ALJ Pantuso did not consider Plaintiff's use of a cane or walker, time off-task, or absenteeism); *but see* Tr. at 61 (noting vocational expert testimony regarding assistive devices, time off-task, absenteeism, and unscheduled breaks); Tr. at 87–89 (including the following additional conditions: use of a cane or walker, off-task tolerance, and unexcused absence tolerance); *see also* ECF No. 8 at 38 (arguing ALJ Pantuso did not consider the effects of Plaintiff's medications); *but see generally* Tr. at 53–60 (reviewing subjective complaints and medications effects under third and fourth steps).) Such a challenge, however, is inappropriate at this stage. *See Cox*, 2025 WL 2556573, at *5. Because the determination that Plaintiff has an RFC to perform sedentary work is supported by substantial evidence in the record, *see supra* Section IV.D, ALJ Pantuso was not required to include the additional proposed limitations of repeated absences or time off task.

Accordingly, the Court finds ALJ Pantuso's determination that jobs exist in significant numbers in the national economy that Plaintiff can perform is supported by substantial evidence in the record and, as such, remand for further administrative proceedings at step five is not warranted.

## V.    CONCLUSION

For the reasons set forth above, Plaintiff's motion to vacate the decision and remand the matter pursuant to sentence six of 42 U.S.C. § 405(g) is **DENIED**; and the Commissioner's decision is **AFFIRMED**. An appropriate order follows.


**Date: June 23, 2026**                        */s/ Brian R. Martinotti*
                                               **HON. BRIAN R. MARTINOTTI**
                                               **UNITED STATES DISTRICT JUDGE**